## THE LAKE CALVENIA.

## THE H. H. ROGERS.

(District Court, E. D. Virginia, at Norfolk. March 1, 1922.)

**Collision 🕮102—Steamships meeting both in fault.**

The steamships Lake Calvenia, going west, and the H. H. Rogers, toward the east, approached at night in a channel a mile or more wide. The Calvenia crossed to the southerly side of the channel, and when a mile apart the vessels exchanged two-whistle signals and proceeded on courses which would have led to a safe passage, starboard to starboard. When perhaps 1,000 feet apart the Rogers gave another signal, of two whistles as claimed, but of one whistle as understood by the Calvenia, which, also thinking she saw the Rogers turning to starboard, ported her own helm; the result being a collision in which she was sunk. *Held*, that both were in fault; the Rogers for giving the second signal, which, even though a repetition of the first, was needless and unwarranted, and likely to be confusing, and the Calvenia in unnecessarily crossing to the wrong side of the channel and in changing her course, which, under the circumstances, was not warranted and brought about the collision.

In Admiralty. Suit for collision by the steamship Lake Calvenia against the steamship H. H. Rogers, with cross-libel. Decree dividing damages.

J. Frank Staley and H. T. Atkins, Sp. Assts. to the Atty. Gen. in Admiralty, Paul W. Kear, U. S. Atty., and H. H. Rumble, Sp. Asst. in Admiralty to the U. S. Atty., both of Norfolk, Va., for the Lake Calvenia.

Kirlin, Woolsey, Campbell, Hickox & Keating, of New York City, and Baird, White & Lanning, of Norfolk, Va. (J. Parker Kirlin and William H. McGrann, both of New York City, and Edward R. Baird, Jr., of Norfolk, Va., of counsel), for the H. H. Rogers.

GRONER, District Judge. The steamer Lake Calvenia, 251 feet in length and 2,364 gross tons burden, on the night of April 10, 1920, while on a voyage from New York to Norfolk, was sunk on the southern side of the channel, between Old Point Comfort and Thimble Shoal Light, as a result of a collision with the steamer H. H. Rogers. The Rogers, a tank steamer of 9,825 gross tons, 500 feet long, was at the time of the collision proceeding out of Hampton Roads, bound to Tampico, Mexico. At the time of the collision neither vessel was loaded, and each was in charge of a Virginia pilot.

A great mass of evidence has been taken, and many aspects of the case discussed at bar, which I think are neither helpful nor necessary to a decision. Neither ship was drawing more than 20 feet of water, and the channel way at the point of collision for vessels of that draught was more than a mile wide. It follows, therefore, that, had each vessel kept her proper course, a collision would not have occurred. As is usual in cases of this character, it is insisted on behalf of each vessel that the other was at fault in refusing to observe the rules of the road; that is to say, in leaving her proper and logical course, and in navigat-

ing on the wrong side of the channel. But the question of whether the collision occurred on the north or the south side of the channel is neither conclusive nor, indeed, important; for if fault existed upon the part of either vessel in navigating too far to the northward, or southward, as the case may be, such fault was condoned by the other vessel, and a situation brought about, by mutual agreement and understanding, whereby no collision could possibly have occurred, except for the subsequent fault of one or the other, or both.

The point of collision, therefore, is of interest principally as furnishing a background which may aid in winnowing the true from the false out of the mass of conflict and contradiction with which the case abounds. The Lake Calvenia was never raised. Her wreck lies now at the bottom of Hampton Roads, marked by a buoy shown on the chart at a point distant northerly about 500 yards from the southern bank of the deep-water channel, and southerly about 800 yards, perhaps, from the northern bank of the same. Counsel on each side insist that her present position is not the point of collision: On the one hand, that after the impact she was shoved by the Rogers further to the south; and on the other hand, that after touching bottom the fresh southerly winds which thereafter prevailed, and the shelving bank, carried her further to the north. But neither theory is supported by substantial proof, and for all practicable purposes the wreck as it lies to-day may be assumed to be the place of collision.

The Lake Calvenia passed Cape Henry about 7:30 p. m. The night was dark, the weather clear, the wind moderate, and the tide ebb. A little before 9 o'clock she passed Thimble Shoal Light some 500 feet or more on her starboard side. From three-quarters of a mile to a mile to the westward, and more or less in her course, an army transport, loaded with explosives and brilliantly lighted, lay at anchor. From 500 to 1,000 feet further west, and perhaps an equal distance to the southward and nearer mid-channel, a four-masted schooner, heavily laden and low in the water, also lay at anchor. The evidence, I think, establishes with reasonable clearness that the Calvenia might have passed safely between these two vessels; but, doubtless having in mind the widom of keeping well away from the army ship, she changed her course so as to pass well to the southward of both vessels. The Rogers in the meantime, coming out from Sewell's Point, had passed the Rip-Raps and set her course slightly to the southward of mid-channel to pass Buoys 17 and 15 on her starboard side.

Each vessel apparently sighted the other about the same time—that is to say, approximately 2 miles away—and each claims to have sounded, two or three times, the proper and customary signal, the result of which, if acquiesced in by the other, would have been to have caused them to pass port to port. Each vessel claims not to have heard any signal from the other vessel until when approximately a mile apart, and at a time when the Calvenia had crossed the course of the Rogers and gotten to a position slightly on her starboard bow. A signal of two blasts was then given and answered; the conflict in the testimony as to which vessel gave the signal and which made the answer being, in my opinion, immaterial. The agreement as to passing was thereupon

made, and each vessel straightened out on a course which would have led to a starboard to starboard passing.

There is no dissent on the part of any witnesses for either vessel that at this time, when the vessels were approximately half a mile away, and when the signal had been given and answered, and each was proceeding on her course, had the navigation of each continued unchanged until after they had passed, the passing would have been safely effected. This, however, was not to be, for when the vessels had approached to a point distant from each other according to some of the witnesses 500 feet, and to others from 1,000 to 1,200 feet—and which I conclude must have been at least 1,000 feet, perhaps a little more—the Calvenia, by the admission of her pilot and her master, put her helm to port, reversed her engines, and proceeded directly across the path of the oncoming vessel. In justification of this maneuver, her pilot and master both testify that just before it was begun they received a one-blast signal from the Rogers, observed her bow begin to turn to starboard, recognized that a collision was inevitable if they continued on their course, and took the steps described in the vain hope of avoiding it. The crash followed, the bow of the Rogers striking the Calvenia on her port side between her foremast and her stem, pushing her head around to the north and east, and passing along her port side until the ship's headway was checked and she was brought back to render what aid was possible.

On behalf of the Rogers the situation is thus described: She had passed Buoy 17, off the western end of Willoughby Spit Shoal, from 700 to 1,000 feet on her starboard side, when for the first time she saw the lights of the Lake Calvenia. The latter vessel was then about two miles away, standing across the channel and showing her green side light. Desiring to pass port to port, the Rogers sounded the usual one-blast signal, and, receiving no answer, repeated this signal again and again. Almost immediately after the third one-blast signal the Rogers heard a two-blast signal from the Calvenia. The vessels were then a little less than a mile apart, and the Calvenia had crossed so far that she was then slightly on the starboard bow of the Rogers. The two-blast signal was answered with a two-blast signal, and the helm of the Rogers put to starboard and steadied. The vessels were then a little more than half a mile apart, the Calvenia showing her range and green lights, and she was then on a course a point and a half on the Rogers' starboard bow. As the vessels continued to approach, the captain of the Rogers, who was then apparently on the port side of the bridge of his vessel and some distance from the pilot, without consultation with or instructions from the pilot so to do, but "to make sure," as he claims, that the other vessel understood the signals which had been agreed to, repeated the two-blast signal and starboarded his helm a little, "to give a little more room."

These statements on behalf of the respective vessels' are in irreconcilable conflict. The two-blast signal which the captain of the Rogers claims he gave, and which the members of his crew who were examined say they distinctly heard, the pilot and those of the crew of the Calvenia who were examined with equal certainty pronounce a one-blast

signal. The movement of the Rogers' helm to starboard and her stem to port, which the captain of that vessel and her pilot declare occurred, the captain and pilot of the Calvenia insist was, on the contrary, a movement of the vessel to starboard. To ascertain the truth in this conflict is fraught with great difficulty. As furnishing a motive for the maneuver which they claim the Rogers made, counsel for the Calvenia point to the presence of the loaded schooner, already referred to, as presenting a sudden and unexpected impediment in the course the Rogers was then pursuing, to avoid which her master, confronted by the emergency, took upon himself the responsibility of changing the signals and altering the course of his vessel.

On behalf of the Rogers, it is insisted that this supposed motive is based upon a false premise and is wholly unconvincing, because at the time the collision occurred the passing of the schooner had been accomplished, and her position from the point of impact, being nearly a quarter of a mile west and north, could not have influenced the navigation of the vessel. The exact location of the schooner, both with reference to the army transport and the wreck, might have been definitely and positively fixed and determined by the evidence of perfectly disinterested witnesses, whose testimony might easily have been procured. The Cape Charles steamer, the Washington steamer, and the two Baltimore steamers all passed between the schooner and the wreck between 6 and 8 o'clock on the morning after the collision. The evidence which their navigators, respectively, might have furnished would have cleared this point of every doubt and relieved the case of serious embarrassment; but unfortunately this was not done, and I am compelled, therefore, in the paucity of the evidence and its unsatisfying character, to determine as best I may whether the presence of the schooner, suddenly discovered in the way of the Rogers, was the inducement or cause for change of course and signal on her part.

The schooner was anchored, as accurately as it is now possible to place her, a little to the northward of mid-channel, and from 500 to 1,000 feet southwestwardly from the transport. She was loaded and lying low in the water. She had the usual anchor light, but it is not unfair to assume that, with the brilliantly lighted transport as a background, her dim anchor light might easily have been mistaken for a light on the transport. It is true the pilot of the Rogers says that he was aware of her presence in the channel way, having been apprised of it by the master of the tugboat which undocked his steamer just before departure. But since the schooner came to anchor between 5 and 6 o'clock that afternoon, and since the undocking of the Rogers could not have occurred later than 8 o'clock, it would not be surprising if the information he obtained in this respect referred to some other schooner than the one in question; and since the master of the tugboat who is alleged to have furnished this information was not examined in corroboration, the inference is not altogether unjustifiable. But, whether so advised or not, nothing appears in the record to indicate that the presence of the schooner was ever reported to the bridge, or that any of the maneuvers of the Rogers prior to the collision were had with reference to her position.

Undoubtedly the Rogers had passed her approximately 1,500 feet easterly and southerly when the collision occurred. If the theory of counsel for the government is correct, the presence of the schooner in the pathway of the Rogers must have been discovered, in order to have avoided her, when the vessels were at least 500 feet apart, and the turning movement of the Rogers to avoid her and the second signal must necessarily have occurred at that point. The result of this would be to place the distance between the Rogers and Calvenia at the time of the second signal of one or two blasts, as the case may be, at about 3,-000 feet; but in the light of the evidence of both steamers as to the distance between them when the second signal from the Rogers was heard—none on either ship fixing this distance at more than 1,000 feet, and most of them at considerably less—the theory of the schooner's interference must be rejected.

Having arrived at this conclusion, what evidence is left to indicate a maneuver on the part of the Rogers such as those aboard the Calvenia charge her with? And, if there is none, can fault be nevertheless imputed to her for what, admittedly, she did do? I think the question must be affirmatively answered, for, if the evidence of her pilot be accepted as correct, both steamers were then on a course which, if maintained, would have caused them not only to pass safely, but with from 300 to 400 feet of water between them, and this safe passing was frustrated when the master of the Rogers sounded the second signal. Unfamiliar as he was with local conditions, separated as he was from the pilot, who was charged with the primary obligation for the safe navigation of the vessel, what reason or excuse may be offered in his behalf?

Viewed from any standpoint the signal was needless, useless, and senseless. His own explanation sheds no light upon the subject. "To be sure" that the other vessel understood signals which had been mutually agreed upon, and which were then not only in the process of being carried out, but were being carried out in open view of all concerned, without the least danger, is to add nothing to the puzzle; or that "it was narrow, and I said, 'Pilot, we had better give another one,' and then make sure"—a statement, by the way, which the pilot denies—is equally without point or reason. If it was narrow, that is to say, if the vessels were approaching one another on courses which made their passing dangerous, and the distance between the two was sufficient for the exchange of signals, four sharp blasts of the whistle should have been given, which to seamen would indicate the query, "What are you trying to do?" If the distance was not sufficient for the exchange of signals, the rules and good seamanship both demanded that backing signals should have been sounded and the engines put full speed astern. If the vessels were then, as the preponderating weight of the testimony indicates, approximately 750 feet apart, showing green to green, neither the rules of navigation nor the dictates of common sense would justify the giving of a signal which, if properly interpreted, meant nothing, but, if incorrectly heard, meant disaster.

By common admission the Lake Calvenia, until the second signal from the Rogers, was pursuing her course precisely and exactly in ac-

cordance with the agreement reached between the navigators of the two vessels. She was in no danger herself, nor was there danger of her inflicting injury to the approaching vessel. At this moment she heard the signal from the Rogers, and thought she observed from her range lights that she was turning to starboard. She answered with one blast, ported her helm, reversed her engines, and proceeded to her doom. True, the master and pilot of the Rogers emphatically deny that at any time prior to the collision their vessel changed her course to starboard, and as earnestly insist that immediately after the signal her helm was again put to starboard and her head turning to port; and this is but another instance of the hopeless conflict, with no satisfactory test existing by which to settle it or positively determine the real facts.

It is not out of place, however, to remark that such corroboration as is to be found tends more strongly to favor the position of the Calvenia than the Rogers, for the records of the engine room of the latter vessel show that for a minute to a minute and a half before the crash her port engine was going full speed ahead, while her starboard engine was stopped, the effect of which, unless neutralized or controlled by the rudder, would have resulted in the movement of her bow to starboard. Without regard, however, to this, the master of the Rogers was, as previously intimated, at fault in giving the second signal—whether it was one blast or two blasts. If it was one blast, it was, of course, directly in the teeth of the law; if it was two blasts, it was negligence in the highest degree, considering the then positions and situations of the vessels, for if understood it could be construed to mean nothing, and if misunderstood was to invite trouble.

The purpose of requiring one vessel to answer the signals of another is to avoid misunderstanding; to create certainty that the signals given are understood as given. If the giving of a signal implied understanding on the part of the approaching vessel, there would be no occasion for an answering signal. The very fact that the rules are so made that the answering signal must be given, or one indicating that the signal is not understood, is conclusive of the experience of navigators that signals may be frequently misunderstood, and it is not wholly uncommon, even in the exercise of due care, to hear, in a quick, sharp two-blast signal, but a single blast. Human nature is fallible, and prudent sailors are often so misled. When, under such circumstances, injury results to their vessel without contributory fault on the part of the opposing vessel, they have only their misfortune to blame for the resulting injury; but where, as in this case, the minds of those directing the opposing vessels have met and the course of the vessels safely set, and one of the parties, by a useless and senseless act, at the most critical moment creates confusion resulting in damage, such person may not escape entire responsibility, even where, except for a misinterpretation or failure of understanding, no injury would have occurred. The master of the Rogers should, for these reasons, be held to have contributed by this negligent act to the collision.

While this is true, it does not follow, in consequence of what has been said, that the navigator of the Lake Calvenia was himself without

fault. On the contrary, he should, in the first instance, have kept his steamer on the northern side of the channel. As already mentioned, if this had been done, he could have passed safely between the transport and the schooner, and avoided all danger of collision with the Rogers. Doubtless he dreaded too close navigation to the vessel loaded with explosives. He therefore turned·out of his course and crossed the thickly traveled channel. This he should not have done. In spite of his denial, I think the evidence clearly establishes that his vessel crossed the Rogers' bow rather than, as he contends, the Rogers crossed his. But I have stated in the forefront of this opinion that his fault in this regard was condoned, and it is mentioned here only as indicative of his lack of prudence and his disregard of a primary obligation.

Having, however, crossed the Rogers' bow, and straightened out on a course which put the Rogers, when half a mile apart, at least two points on his starboard bow, and having by the interchange of signals agreed to a starboard to starboard passing, he was neither permitted nor justified, in anything that subsequently occurred, in changing his course. Between 500 and 1,000 feet away he heard the second signal of the Rogers, which he claims he took to be a crossing signal, and observed, or thought he observed, a turning movement on the part of the Rogers in his direction. If all this be true, it is no excuse for what he did. The duty was then imposed upon him of either sounding danger signals and proceeding on his course, or sounding reverse signals and going full speed astern. He did neither of these things, but acquiesced in the crossing signal of the approaching vessel, as he understood it, answered the one blast with one blast, put his helm to port and his head to starboard, and made a collision inevitable.

It is true he says a collision would have occurred in any event. The circumstances do not prove this beyond peradventure. If, as the witnesses on both ships say, each had the other, at the distance of half a mile, from a point and a half to two points on the starboard bow, and if, as the witnesses for each vessel say, the course of each vessel until just before the collision was maintained unchanged, it follows that there was from 300 to 400 feet of passing room, and it by no means follows that this would not have been ample to have prevented the collision had the Calvenia kept on her course, thrown her helm to starboard, or stopped or checked her headway and backed. The one thing she should not have done she did. Her failure to interpret the signal of the Rogers correctly—assuming the Rogers' signal to have been two blasts—for the reasons stated above, I do not ascribe as a fault on her part.

Under the circumstances surrounding that signal, no fault may be imputed because it was misunderstood. But, even if it were one blast, it would not have justified the movement which took place on the Calvenia. She responded quickly to her rudder; prudent navigation, even under such circumstances, would most likely have taken her out of the danger zone. The vessels were close together, but the emergency was not such as made it a case in extremis. To a prudent and skillful navigator there was time to have avoided the danger. The chance was lost; the thing of all things was done which should not have been done; and

in this respect those in charge of the navigation of the Calvenia were at fault.

The faults being equal, the damages will be divided, and a decree accordingly may be entered.